**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No.  21-2639
_____

UNITED STATES OF AMERICA,

v.

WILLIAM VALENTIN,
Appellant
_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. No. 2-18-cr-0403-001)
District Judge:  Honorable Madeline C. Arleo
_____

Argued
November 29, 2023

Before:   JORDAN, MONTGOMERY-REEVES, and
McKEE,
*Circuit Judges*

(Filed: October 7, 2024)
_____

Anthony J. Pope   [**ARGUED**]
The Pope & Hascup Law Group
60 Park Place – Suite 1101
Newark, NJ   07102

Annette Verdesco   [**ARGUED**]
Caruso Smith & Picinni
60 Route 46 E
Fairfield, NJ   07004
        *Counsel for Appellant*
Mark E. Coyne
John F. Romano
Office of United States Attorney
970 Broad Street Room 700
Newark, NJ   07102
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**JORDAN**, *Circuit Judge*.

William Valentin, along with four other men, robbed a jewelry store in New Jersey.  During the robbery, Valentin pointed a loaded gun at a store employee.  In the course of preparing for the crime and then carrying it out, stealing nearly $900,000 in jewelry, the robbers left behind a mountain of evidence: video footage, fingerprints, identifiable DNA, cell phone records, location data, and more.  A jury convicted Valentin of Hobbs Act robbery, conspiracy to commit Hobbs Act robbery, use of a firearm during a crime of violence, and

conspiracy to use a firearm during a crime of violence. The District Court then sentenced him to a term of imprisonment within the applicable sentencing guidelines range. On appeal, Valentin raises a series of challenges to the convictions and sentence. We will affirm and take the occasion to clarify that brandishing a firearm during a robbery is itself a crime of violence under the guidelines.

## I.    BACKGROUND

### A.    Facts

In September 2017, Valentin, along with Carlos Velasquez and two other men, crashed through a security gate and robbed Elegant Creations, a jewelry store in the Jersey Gardens Mall in Elizabeth, New Jersey. Valentin, wearing a Mets cap, pointed a loaded gun with an extended magazine at a store employee who fled the scene, screaming and "scared" that she was "gonna die." (Supp. App. at 73.) After filling bags with jewelry, watches, and, among other custom items, a Yankees pendant, the men escaped through another store and met Jonathan Arce, Valentin's cousin, who was waiting in a getaway car.

Velasquez, who became a government witness, testified at trial that Valentin had planned the details of the robbery and recruited him to participate with "a few other people[,]" and that Arce procured the getaway car – a black Audi with tinted windows. (Supp. App. at 400.) He further testified that, a week before the robbery, the group conducted a "dry run" and drove the Audi to the mall parking lot, leaving their phones in Newark, New Jersey. (Supp. App. at 405.) On the day of the robbery, the men drove the Audi to a tire shop, where they

changed a flat tire and put a stolen license plate on top of the car's real plate. During the robbery, the men left their phones in their cars and used burner phones to call lookouts on the highway and at the mall to ensure favorable conditions for the plan.

Following the robbery, Arce wiped the car down to remove fingerprints, and he and Valentin attempted to use a heat gun to remove the tint from the windows, which left behind a glue residue. That evening, Valentin paid Velasquez $10,000 in cash for his role in the robbery.

The police soon located the abandoned Audi in Newark. The real license plate was visible, the windows were sticky because of the attempted tint removal, and Arce's fingerprints and DNA were present. They also recovered pieces of the broken license plate frame. Video footage from the tire shop showed the men at the shop, wearing the same clothes they wore during the robbery and adding a license plate to an Audi with tinted windows.

About a week after the robbery, the police received a phone call identifying Valentin, Arce, and Velasquez as suspects. That same day, the Elizabeth Police Department contacted the Essex County Prosecutor's Office because, coincidentally, two Essex County detectives, Robert O'Neil and Christopher Smith, had interviewed Arce a few weeks earlier during an unrelated investigation. When shown video footage from the mall and tire store, both officers identified Arce, due to their previous interrogation of him, as the man wearing the Mets hat, although Detective Smith was only 75 percent certain.

Two days later, a multijurisdictional team of law enforcement officials detained Arce as he boarded a plane at Newark Airport.[1]  After detaining him, they showed still photographs of the robbery suspect to Valentin and Arce's cousin Ashley Arce, who is a Newark police officer (and whom we will refer to as "Officer Arce" to distinguish her from her cousin Jonathan Arce, whom we have been calling "Arce"). She identified the robbery suspect as Valentin.  A week later, Officer Arce sat for an interview with Elizabeth detectives. During that interview, she reviewed photographs of Arce and Valentin that were unrelated to the robbery and reviewed still images from the tire shop footage.  When reviewing the unrelated photographs, Officer Arce identified a man wearing a green hat, gray Nike shirt, black pants, and white sneakers as Arce, and a man wearing a dark hat, black shirt, jeans, and dark shoes as Valentin.  When viewing stills from the tire shop footage, Officer Arce identified the man wearing the Mets hat as Valentin.  She recognized Valentin from "the ears, and the nose, and the eyes, … [and] the body."  (Supp. App. at 248.) When asked how she knew both men, she noted that she had seen them both "thousands of times"[2] because both are her cousins.  (Supp. App. at 192.)

The Elizabeth Police issued complaints against Valentin and Velasquez before the United States took over prosecution of the crimes.  Federal agents arrested Velasquez soon after,

---

[1] Police expected to find both Arce and Valentin at the airport flying to the Dominican Republic on a family vacation.

[2] Officer Arce later testified that this number was "between 50 and 100 times[.]"  (Supp. App. at 192.)

5

and he entered into a plea agreement with the government, agreeing to testify against Valentin.  In January 2018, Valentin was arrested.  At that time, he had in his possession a bag containing $15,000 in cash and nine pieces of stolen jewelry – including the custom Yankees pendant and a piece with an Elegant Creations' tag.  Valentin's phone also contained text messages in which he asked for money for a bracelet and stated that he may "have to go to jail."  (Supp. App. at 666.)

### B.    Procedural History

In February 2018, the government filed a superseding indictment in the District of New Jersey charging Valentin with four counts: (1) conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); (2) Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2; (3) use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; and (4) conspiracy to use a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(o).  The case went to trial but resulted in a mistrial.[3]

A year later, the government retried Valentin.  During the seven-day trial, the jury heard testimony from the jewelry store employee, from several law enforcement and expert witnesses, and from Velasquez and Officer Ashley Arce.  The latter two identified Valentin as the man in the Mets hat who

---

[3] The government initially tried Valentin and Arce together; however, the jury acquitted Arce of all counts and failed to reach a verdict as to Valentin, so the District Court declared a mistrial.

brandished a gun at the employee.  The jury also saw surveillance footage from the mall and tire shop and heard testimony about the jewelry that police found on Valentin at the time of his arrest and also about the incriminating text messages.  Additional evidence was presented, including traffic tickets, rental car agreements, license plate reader information, telephone records, seized jewelry, and biometric data, all of which corroborated Velasquez's testimony.  After less than a day of deliberations, and despite hearing that no fingerprints or DNA retrieved from the crime scene or getaway car matched Valentin's, the jury found Valentin guilty on all counts.

The District Court sentenced him as a career offender and calculated the applicable sentencing guidelines range as 360 months' to life imprisonment.  In light of the "overwhelming evidence" of guilt, the "very serious" nature of the offense, Valentin's "atrocious" criminal record, resulting in a 54-point criminal history score, and his history of "unnecessary, unwarranted violence," the Court determined that "[t]here [wa]s no basis here for a [downward] variance," "not at all, not even close."  (Supp. App. at 1150-58.)  Valentin did not object to the stated basis for the sentence, and the Court imposed a within-guidelines sentence of 360 months' imprisonment, 5 years' supervised release, and $889,844.33 in restitution.  Valentin has timely appealed.[4]

---

[4] We earlier granted the government's motion for a partial remand to address a conflict-of-interest issue with appellate counsel, which the District Court resolved.  The matter is now properly before us for a decision on the merits.

## II.    DISCUSSION[5]

Valentin mounts several challenges to his conviction and sentence.  First, he argues that the District Court abused its discretion when it admitted certain non-eyewitness identification testimony but excluded other similar testimony, and when it also admitted evidence of a prior criminal relationship between him and Velasquez.  Second, he contends that two of the Court's jury instructions were plainly erroneous.  And third, he attacks the reasonableness of his sentence, as well as the District Court's finding that brandishing a firearm qualifies as a crime of violence under the sentencing guidelines.  We are unpersuaded by those arguments, and, for the reasons that follow, will affirm the convictions and sentence in their entirety.

### A.    Trial Challenges

Valentin says that he "received an unfair trial." (Opening Br. at 2.)  It appears, however, that he is simply unhappy with the result.  He was caught red-handed following a robbery and the evidence presented against him at trial was, as the District Court observed, "really overwhelming."  (Supp. App. at 1153.)

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

1. *Identification Testimony Challenges*[6]

Valentin takes particular issue with the District Court's decisions to both admit Officer Arce's testimony identifying him as the man in the Mets cap in surveillance footage and then to exclude the Essex County detectives' identification of his cousin Jonathan Arce as that same man. According to Valentin, the "inconsistent rulings" violated his "Sixth Amendment right to put on [a] defense." (Opening Br. at 7, 8.) But admission or exclusion of such lay opinion testimony will not typically give rise to a constitutional challenge. *Orie v. Sec'y Pa. Dep't of Corr.*, 940 F.3d 845, 854-55 (3d Cir. 2019) ("The Sixth Amendment's Compulsory Process Clause does not give a defendant the right to introduce any testimony []he likes. Courts may exclude … inadmissible testimony under the rules of evidence." (citation omitted) (citing *Taylor v. Illinois*, 484 U.S. 400, 410 (1988))). Even assuming that the District Court abused its discretion, though, those errors do not warrant reversal.

First, Valentin challenges the admission of Officer Arce's testimony as improper because she "had not seen Valentin in over a decade." (Opening Br. at 20.) The District Court was unconvinced by that she's-a-stranger argument. It admitted the testimony under Federal Rule of Evidence 701 because, as Valentin's cousin, who had seen him more than

---

[6] We review evidentiary rulings for abuse of discretion. *United States v. Desu*, 23 F.4th 224, 233 (3d Cir. 2022). Even if there is error, "the [District] Court's ruling will stand if the error was harmless … ." *United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010) (citation omitted).

fifty times in her life, "the witness … had sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful." *United States v. Fulton*, 837 F.3d 281, 297 (3d Cir. 2016) (internal quotation marks omitted) (listing as indications of helpfulness of lay witness identification testimony, among other things, "whether the witness knew the defendant over time and in a variety of circumstances, such that the … testimony offered to the jury a perspective it could not acquire in its limited exposure to the defendant" (internal quotation marks omitted)).    Officer Arce specifically recognized Valentin from his "ears, ... nose, ... eyes, … [and] ... body."  (Supp. App. at 248.)    While Arce's subsequent identifications of Valentin at the police station were due to Valentin wearing similar clothing as the robbery suspect in later photographs, they merely corroborated her earlier identification based on her personal knowledge of Valentin's appearance.  *Fulton*, 837 F.3d at 298.  So, if Valentin's arguments in this vein were all that were at issue here, we would be inclined to uphold the District Court's evidentiary decision as being within the Court's discretion.  But there is more.

Like our concurring colleague, we are concerned with the coercion surrounding Officer Arce's identifications.  The threats to her job as a police officer – both directly and indirectly – undermine the reliability of her identifications.  *Cf.* Fed. R. Evid. 701(a) (limiting lay testimony to "one that is rationally based on the witness's perception" (cleaned up)).  Her own testimony supports that conclusion.  (Supp. App. 249 ("I thought I was going to lose my job. ... I was just scared that if I didn't basically say what I said in the airport [identifying Valentin] that I was going to be in trouble.").)  And, at trial, Officer Arce did not definitively identify the man in the

photographs as Valentin. (Supp. App. at 264 (Q: "[A]s you sit here today, are you sure that that was William Valentin in those photos?" A: "No.").) Thus, there is sound reason to question the admission of the identification testimony from Officer Arce.

We need not, however, decide that issue because, if there was error, it was harmless, given the other evidence of Valentin's guilt. As already described, that evidence was overwhelming[7] and the identification testimony at trial, such as it was, was lackluster. *Cf. United States v. Auernheimer*, 748 F.3d 525, 539 (3d Cir. 2014) ("In order for an error to be harmless, the Government must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (internal quotation marks omitted)).

Similarly, the District Court's exclusion of the Essex County detectives' testimony, assuming error, was harmless because "it is highly probable that the error did not affect the result." *United States v. DeMuro*, 677 F.3d 550, 557 (3d Cir. 2012) (internal quotation marks omitted). In making that determination, "we must assess the impact of the error in context with all of the evidence of [Valentin]'s guilt[,]" which is "particularly damning." *Fulton*, 837 F.3d at 301. And "[u]nder the 'highly probable' standard … there is no need to disprove every reasonable possibility of prejudice. While the

---

[7] As a reminder, such additional evidence included multiple surveillance videos, eyewitness testimony from the employee of the jewelry store, Velazquez's testimony regarding the entire conspiracy, phone records, text messages, traffic tickets, the black Audi, and more.

Government bears the burden of showing that the error was harmless, we can affirm for any reason supported by the record." *United States v. Cross*, 308 F.3d 308, 326 (3d Cir. 2002) (cleaned up).  Although the detectives' testimony would have told the jury that Arce – not Valentin – was the man in the Mets hat, that would not have erased from the jury's memory the overwhelming corroborating evidence of Valentin's guilt, including that he was arrested with $15,000 in cash and nine pieces of stolen jewelry, among which was a bracelet with an Elegant Creations' tag and the custom Yankees pendant.[8]

The District Court's evidentiary rulings thus survive harmless error analysis, even if they were erroneous.  *Fulton*, 837 F.3d at 301 (affirming the district court's admission of erroneous identification testimony by detectives due to other evidence tying defendant to a robbery).

### 2.  *Conspiracy Evidence Challenge*[9]

Valentin also argues that the District Court erred in admitting communications between him and Velazquez regarding prior criminal pursuits to show a conspiratorial relationship between the men.  Valentin's argument relies primarily on the fact that the Court had ruled such evidence inadmissible in the first trial as "unduly prejudicial[.]" (Opening Br. at 34.)  But "a retrial of a case is exactly what it says; it is a *retrial*, not a replay.  A district court retains the

---

[8] *See supra* note 7.

[9] We review evidentiary rulings for abuse of discretion. *Desu*, 23 F.4th at 233.

power to reconsider previously decided issues as they arise in the context of a new trial." *United States v. Cunningham*, 679 F.3d 355, 377 (6th Cir. 2012) (internal quotation marks omitted and emphasis in original).

Moreover, assuming that the District Court erred, admitting those communications was harmless.  Once more, the evidence of Valentin's guilt "was really overwhelming," and the testimony about the conspiratorial relationship was brief and, later, was barely alluded to during the government's closing argument.  (Supp. App. at 1153.)   Because "the government did not rely on [the communications between Valentin and Velasquez] in its summation, stressing instead the mountain of [other] evidence[,]" *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996), there is no realistic probability that the elimination of the challenged testimony would have changed the verdict.[10]

### 3.  *Jury Instructions Challenges*[11]

Valentin complains of two jury instructions given by the District Court.   First, he argues that an aiding-and-abetting

---

[10] The Court gave a limiting instruction to the jury to "consider this evidence only for the purpose of deciding whether the Defendant William Valentin and Carlos Velazquez had a relationship such that Carlos Velazquez was invited to join the conspiracy.  Do not consider the evidence for any other purpose."  (Supp. App. at 909.)

[11] Typically, "[w]here the challenge to a jury instruction is a challenge to the instruction's statement of the legal standard, we exercise plenary review.  Otherwise, we review

instruction, later stricken, tainted the verdict. And second, he argues that the Court failed to instruct the jury on the definition of "physical force," which may have led the jury to convict him for brandishing a firearm during a crime of violence, despite inadequate evidence of force. Neither instruction was infirm but, even if they were, they did not change the outcome.

First, Valentin did not object to the curative instruction striking the aiding-and-abetting instruction. The Court told the jury "to disregard" the initial instruction and to "not [] consider that charge in rendering your verdict and in your deliberations." (Supp. App. at 954.) The jury instruction book was also amended. Thus, it is not clear that Valentin has any real basis for his present objection. *Cf. United States v. Pungitore*, 910 F.2d 1084, 1128 (3d Cir. 1990) ("Inasmuch as appellants did not object to the curative instruction or request additional instructions, they apparently were satisfied with the district court's response and cannot now complain.").

Assuming error, however, Valentin bears the burden of showing that, under the plain error standard, the supposed misstep affected his "substantial rights," or that there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 593 U.S. 503, 504 (2021) (quoting *Rosales-Mireles v.*

---

challenges to jury instructions for abuse of discretion." *United States v. Urban*, 404 F.3d 754, 779 (3d Cir. 2005) (internal quotation marks and citation omitted). But here, as Valentin concedes, "[i]n the absence of a timely objection, we review only for plain error." *Gov't of Virgin Islands v. Fonseca*, 274 F.3d 760, 765 (3d Cir. 2001).

*United States*, 585 U.S. 129, 134-35 (2018)).  He has not done so.

His allegation that "there is no assurance the verdict [wa]s free from … taint" (Opening Br. at 3), is insufficient to meet the plain error standard.  "[I]t is not enough for [Valentin] to establish that it is impossible to tell whether the verdict returned by the jury rested solely on the misinstruction, for such a showing would establish only that the error was not harmless. … [He] must demonstrate that the erroneous [] instruction given by the district court resulted in his conviction."  *United States v. Hastings*, 134 F.3d 235, 243-44 (4th Cir. 1998) (citation omitted).  Furthermore, "we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions."  *United States v. Franz*, 772 F.3d 134, 152 (3d Cir. 2014) (quoting *Francis v. Franklin,* 471 U.S. 307, 324 n.9 (1985)).

Valentin also challenges the District Court's failure to instruct the jury on the definition of "physical force" in a special interrogatory relating to Count Three, brandishing a firearm during a crime of violence, namely, Hobbs Act robbery.[12]  He again failed to object to that instruction, and cannot now show that the instruction was error or that it resulted in his conviction.    To begin with, the Court's instruction was taken nearly verbatim from our model jury instructions.  *Compare* (Supp. App. at 921-25, 928-29), *with*

---

[12]  The special interrogatory asked whether "the defendant's conduct involve[d] a substantial risk that physical force would be used against the person or property of another?" (App. at 4.)

3d Cir. Model Jury Instructions 6.18.924B, 6.18.1951–1951-7 (only minor stylistic differences). "We have a hard time concluding that the use of our own model jury instruction can constitute error[.]" *United States v. Petersen*, 622 F.3d 196, 208 (3d Cir. 2010) (noting that, as in this case, the defendant "d[id] not even contend that the model instruction is wrong").

Furthermore, the jury's answer to the interrogatory at issue, which is related to what is known as the "residual clause" of 18 U.S.C. § 924(c)(3)(B) is superfluous to Valentin's conviction because Hobbs Act robbery is a crime of violence under another provision of the statute, known as the "elements clause," § 924(c)(3)(A).[13] *United States v. Stoney*, 62 F.4th 108, 112-13 (3d Cir. 2023) ("[J]oin[ing] the unanimous Circuit authority in holding that a completed Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)[.]"). The jury confirmed in an additional special interrogatory that it

---

[13] According to 18 U.S.C. § 924(c)(3),

> a crime of violence is "an offense that is a felony" and "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

*United States v. Davis*, 588 U.S. 445, 449 (2019). The Supreme Court in *United States v. Davis*, which postdated the trial at issue here, struck down subsection (B), the residual clause, as unconstitutionally vague and violative of the Due Process Clause. Subsection (A), the elements clause, remains.

found that "the defendant brandish[ed] the firearm during a crime of violence, that is, the Hobbs Act robbery charged in Count Two." (App. at 4.)  Thus, since brandishing a firearm is a "threatened use of physical force against … another" under § 924(c)(3)(A), the first interrogatory was irrelevant.  *Cf. United States v. Griffin*, 946 F.3d 759, 761 (5th Cir. 2020) ("[R]eliance on the residual clause [i]s harmless if [defendant's] … conviction[] also satisfie[s] the other, still-valid definitions … under the elements clause.").

Accordingly, neither instruction was in error, and even if they were, they did not affect the validity of the verdict.

## B.    Sentencing Challenges

Finally, Valentin argues that his sentence is both procedurally and substantively unreasonable.  Specifically, he contends that the Court incorrectly held that brandishing a firearm during a crime of violence is itself a crime of violence under the guidelines, making him a career offender.  He also argues that the District Court should have departed downward from his career offender range, should have granted a downward variance due to mitigating circumstances, and erred by imposing a substantively unreasonable sentence.  All of those arguments fail.

### 1.  Career Offender Challenge[14]

Valentin argues that the District Court plainly erred in finding that his conviction under 18 U.S.C. § 924(c) for

---

[14] We review the District Court's interpretation of the sentencing guidelines de novo, *United States v. Adair*, 38 F.4th

brandishing a weapon during a crime of violence was itself a separate crime of violence. As Valentin sees it, calling the § 924(c) conviction a crime of violence has resulted in him being misclassified as a career offender.[15] Section 4B1.1 of the guidelines provides that a defendant is a career offender if: (1) he was at least eighteen years old at the time of the instant offense; (2) the instant offense is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1(a). The District Court applied that section to Valentin after deciding that his brandishing of a gun during the Elegant Creations robbery was a crime of violence.

The guidelines define a "crime of violence" as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, … that has as an element the use, attempted use, or threatened use of physical force against

---

341, 347 (3d Cir. 2022), but we accept its findings of fact "unless they are clearly erroneous and, … [we] give due deference to the [D]istrict [C]ourt's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *United States v. Richards*, 674 F.3d 215, 218, 219 n.2 (3d Cir. 2012).

[15] Valentin never raised this argument before the District Court, despite challenging his career offender classification on other grounds, including that his Hobbs Act conviction in the instant offense was not a violent felony under U.S.S.G. § 4B1.2. He must now demonstrate reversible plain error on these grounds. *United States v. Dahl*, 833 F.3d 345, 349 (3d Cir. 2016).

the person of another[.]" U.S.S.G. § 4B1.2(a)(1). Despite that clear definition, Valentin argues that we should instead be guided by the commentary to section 4B1.2.[16] He fails, however, to show that the guideline is ambiguous, as our decision in *United States v. Nasir* says is required before turning to commentary. 17 F.4th 459, 469-71 (3d Cir. 2021) (en banc). That is fatal to his argument. We therefore have no basis to disagree with the District Court's classification of Valentin as a career offender.

Even if he had done more to carry his burden on this point, the end would be the same. To determine whether a conviction qualifies as a crime of violence, we apply the "categorical approach" to "compar[e] the guidelines' definition of 'crime of violence' to the elements of the statute under which the defendant was ... convicted." *United States v. Abdullah*, 905 F.3d 739, 744 (3d Cir. 2018). The jury convicted Valentin under 18 U.S.C. § 924(c)(1)(A)(ii) of brandishing a firearm during a crime of violence, which

---

[16] The commentary says, "A violation of 18 U.S.C. § 924(c) ... is a 'crime of violence' ... if the offense of conviction established that the underlying offense was a 'crime of violence.'" U.S.S.G. § 4B1.2 cmt. n.1. Valentin argues that the underlying crime of Hobbs Act robbery is not a crime of violence under the guidelines, and he has support for that. *United States v. Scott*, 14 F.4th 190, 193-98 (3d Cir. 2021) (holding that the underlying offense here – Hobbs Act robbery – is not a crime of violence under the sentencing guidelines). But *Scott* does not control the question before us: whether the brandishing of a gun is a crime of violence under the sentencing guidelines.

necessitated a finding that Valentin "brandished" a firearm[17] and that he did so during a crime of violence – here, Hobbs Act robbery.[18] *Cf. Alleyne v. United States*, 570 U.S. 99, 115 (2013) ("[B]ecause the fact of brandishing aggravates the legally prescribed range of allowable sentences, it constitutes an element of a separate, aggravated offense that must be found by the jury[.]"). A finding of brandishing requires the jury to have found that the defendant "display[ed] all or part of the firearm, or otherwise ma[d]e the presence of the firearm known to another person, in order to *intimidate that person*, regardless of whether the firearm is directly visible to that person." 18 U.S.C. § 924(c)(4) (emphasis added).

The "in order to intimidate" language of section 924(c)(4) satisfies section 4B1.2(a)(1)'s requirement that the crime of violence offense "has as an element the use, attempted use, or threatened use of physical force against the person of another[.]" U.S.S.G. § 4B1.2(a)(1). In other words, brandishing a firearm "to intimidate [a] person[,]" 18 U.S.C. § 924(c)(4), necessarily involves a "threatened use of physical

---

[17] "[A]ny person who, during and in relation to any crime of violence … uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence … *if the firearm is brandished*, be sentenced to a term of imprisonment of not less than 7 years[.]" 18 U.S.C. § 924(c)(1)(A) (emphasis added).

[18] We held in *United States v. Stoney* that "a completed Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)[.]" 62 F.4th 108, 113 (3d Cir. 2023).

force against [a] person[,]" U.S.S.G. § 4B1.2(a)(1); *see United States v. Wilson*, 880 F.3d 80, 85 n.4 (3d Cir. 2018) ("The word 'intimidate' is defined in the dictionary as 'to make … fearful' or 'to compel or deter by or as if by threats[.]'" (first alteration in original) (quoting *Merriam-Webster Dictionary*)); *see also Intimidation*, *Black's Law Dictionary* (11th ed. 2019) ("The wrong of intimidation includes … harm [] inflicted by the use of unlawful threats[.]" (quoting R.F.V. Heuston, *Salmond on the Law of Torts* 364 (17th ed. 1977))).  Thus, we hold that brandishing a gun during a crime of violence (here, Hobbs Act robbery) qualifies as a crime of violence under guidelines section § 4B1.2(a)(1).

It follows that the District Court did not plainly err in applying section 4B1.1 to Valentin, classifying him as a career offender, and sentencing him under the corresponding guidelines range.

### 2.  *Reasonableness Challenges*[19]

When we review the reasonableness of a sentence, we first determine whether the district court committed any significant procedural errors.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  Such errors include "failing to calculate (or improperly calculating) the [g]uidelines range, treating the [g]uidelines as mandatory, failing to consider the §3553(a)

---

[19] We review the procedural and substantive reasonableness of a sentence for abuse of discretion.  *United States v. Woronowicz*, 744 F.3d 848, 851 (3d Cir. 2014).  Unpreserved challenges to the reasonableness of the sentence are reviewed only for plain error.  *See Dahl*, 833 F.3d at 349.

factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the [g]uidelines range." *Id*. We then turn to the substantive reasonableness of the sentence based on "the totality of the circumstances," and "apply a presumption of reasonableness" if the sentence is within the guidelines range. *Id.* We will not reverse a sentence as substantively unreasonable "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc). The party challenging the sentence has the burden to show that a sentence is substantively unreasonable. *United States v. Friedman*, 658 F.3d 342, 360 (3d Cir. 2011).

Valentin contends that the Court should have departed downward from the career offender range under U.S.S.G. § 4A1.3(b)(1) because his criminal history category was substantially overstated.[20] His argument is a non-starter. We decline to review a district court's discretionary decision to deny a sentencing departure. *United States v. Cooper*, 437

---

[20] His argument depends on the District Court erroneously counting convictions that fell outside U.S.S.G. § 4A1.1(a)'s fifteen year limit. Valentin concedes the error of his own argument – that his predicate convictions fell outside of the relevant time frame of U.S.S.G. § 4A1.2(e) – when he admits that the offense at issue occurred "inside the 15-year look back period." (Opening Br. at 43; *see also* Supp. App. at 1078 ("[H]ad there not been a delay between the two sentences … those two cases *would have been* out of the applicable 15-year limitation." (emphasis added)).)

F.3d 324, 333 (3d Cir. 2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007).

Valentin next says the COVID-19 pandemic and consequent prison conditions should have resulted in him receiving a lower sentence. Not so. The District Court correctly found that a variance based on jail conditions during the pandemic was unwarranted. The Court explicitly considered Valentin's argument as it weighed the § 3553(a) factors, and "we [do not] find that [the] [D]istrict [C]ourt's failure to give mitigating factors the weight [the] defendant contends they deserve renders the sentence unreasonable."[21] *United States v. Bungar*, 478 F.3d 540, 546 (3d Cir. 2007).

Finally, despite his protestations that his "sentence cannot be described as 'reasonable[,]'" Valentin received a within-guidelines sentence. (Opening Br. at 50.) And "[a]s long as a sentence falls within the broad range of possible sentences that can be considered reasonable in light of the § 3553(a) factors, we must affirm."[22] *United States v. Wise*, 515 F.3d 207, 218 (3d Cir. 2008). And so, we will.

---

[21] Valentin calls his request for a variance a "departure" numerous times in his briefing. (*See, e.g.*, Opening Br. at 47, 49.) To the extent that his claim is that the District Court abused its discretion in denying a downward departure, that claim is unreviewable, as discussed above. *See, e.g.*, *United States v. Cooper*, 437 F.3d 324, 333 (3d Cir. 2006).

[22] Moreover, Valentin's lengthy sentence was largely driven by his correct classification as a career offender under U.S.S.G. § 4B1.1(a).

### III.     CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment of conviction and sentence.

USA v. William Valentin, No. 21-2639

**McKEE**, *Circuit Judge*, concurring.

I concur with my colleagues' opinion except for the discussion of the identifications that occurred in this case.

I believe the District Court erred in both of its lay opinion identification rulings. The District Court's identification rulings were upside down, and I have no idea how the court could have ruled as it did. The Essex County detectives had enough familiarity with Jonathan Arce to identify him as the person reflected in the security camera footage that was captured shortly before the robbery. By contrast, Officer Ashley Arce was not sufficiently familiar with Valentin to identify him as the person in the footage. Further, I am concerned that Officer Arce's identification testimony was not rationally based on her perception but was instead the product of suggestion and coercion. Accordingly, I cannot join the Majority opinion, but I join in the judgment and write separately to explain these concerns.

## I.

The admissibility of a lay opinion identification—such as a witness's opinion about the identity of the person in a picture—is governed by Federal Rule of Evidence 701. Under that rule, lay opinion identification is admissible so long as it

is "rationally based on the witness's perception" and is "helpful to . . . determining a fact in issue."[1]

A lay witness's opinion is not helpful if the witness is no more familiar with the person being identified than the jury. In *United States v. Fulton*,[2] for example, two FBI agents testified that a person captured in surveillance footage was the defendant and was not an alternative suspect.[3] We found both opinions unhelpful. The first agent's opinion was unhelpful because his interactions with the defendant and the alternative suspect were "very limited" and because he had not interviewed the alternative suspect until "nearly two months after" the crime.[4] The second agent's opinion was unhelpful because his familiarity with the defendant and the alternative suspect was "even more attenuated"—he met the alternative suspect for the first time at trial.[5] Neither agent had unique insight into the defendant's or the alternative suspect's appearance at the time the surveillance footage was recorded.[6] As a result, neither agent was better equipped than was the jury

---

[1] Fed. R. Evid. 701(a)–(b).

[2] 837 F.3d 281 (3d Cir. 2016).

[3] *Id.* at 295–97.

[4] *Id.* at 299.

[5] *Id.*

[6] *Id.* ("These minimal relations provided neither [agent] with familiarity with the defendant's appearance at the time the crime was committed, the defendant's customary manner of dress, or the defendant in a variety of circumstances.").

to compare the defendant or alternative suspect to the person captured in the surveillance footage.[7]

We have never specified when a witness becomes sufficiently familiar with a person to provide a helpful lay opinion identification. However, precedents from other courts of appeals are instructive. The Court of Appeals for the Ninth Circuit found a probation officer's identification helpful because the officer had seen the defendant "four times in a two-month period, for a total of more than seventy minutes."[8] The Court of Appeals for the Tenth Circuit found another probation officer's identification helpful because the officer had met the defendant "for between five and ten minutes on multiple occasions."[9] And the Court of Appeals for the Eleventh Circuit found a police officer's identification helpful because the officer spent an hour with the defendant while the officer was placing the defendant under arrest.[10]

While these precedents might endorse *too* liberal a standard for familiarity, it is clear that the Essex County detectives' familiarity with Jonathan Arce substantially exceeded that standard. Prior to identifying the individual in

---

[7] *Id.* ("These agents were no better equipped than the jurors to compare the . . . appearance [of the person in the surveillance footage] with that of [the alternative suspect] and [the defendant].").

[8] *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005).

[9] *United States v. Contreras*, 536 F.3d 1167, 1171 (10th Cir. 2008).

[10] *United States v. Ware*, 69 F.4th 830, 850–51 (11th Cir. 2023).

the security footage as Jonathan Arce, the Essex County detectives had spent two hours interviewing him within the close confines of an interrogation room.  The record does not disclose much about the circumstances of this interview, but it is reasonable to assume that the detectives had ample opportunity to study Arce's appearance.  Both detectives would have been sitting within feet of Arce, focusing their attentions on him and with no distractions in their surroundings.  Further, this interview took place just three weeks before the security footage was recorded.  It is therefore unlikely that Arce's appearance had significantly changed.

The government argues that the Essex County detectives' identifications were unhelpful because the detectives were not familiar with *Valentin* and would not, therefore, have been able to say whether the person in the security footage looked like Valentin.  This argument misses the point.  Certainly, the ultimate question at trial was whether the man in the footage was Valentin.  It follows that any reliable opinion bearing on that question would have been helpful to the jury.  If two witnesses who were familiar with Arce believed the person in the footage was Arce, then their opinions would have made it *more likely* that the person in the footage *was Arce*.  By corollary, unless Arce and Valentin were identical twins, the same opinions would have made it *less likely* that the person in the footage *was Valentin*.

The government also argues that the Essex County detectives' opinions were unhelpful because they were "wrong."[11]  But the very reason lay witnesses were asked to identify the person in the photograph is that the person's

---

[11] Gov't Br. 18.

identity remained in dispute.  The government does not point to any evidence that would have indisputably removed Arce from the cohort of individuals who could have been the person in the security footage.  To the contrary, much of the evidence that implicated Valentin also implicated Arce, leaving Arce as the most plausible alternative suspect to be the person in the footage.

On the other hand, I simply do not see how one could reasonably conclude that Officer Arce had sufficient familiarity with Valentin to tender a helpful identification of him.

Prior to identifying Valentin, Officer Arce had not seen Valentin—either in person or through social media—for *more than a decade*.  The last time Officer Arce would have seen Valentin, Officer Arce would have been about sixteen years old, and Valentin would have been about twenty-eight.  Officer Arce had no idea how Valentin's appearance had changed in the more-than-decade since she had last seen him.  No one can dispute the fact that we all change with age, and the ways Valentin could have changed since Officer Arce last saw him are innumerable.[12]  Based on the record before us, there is no basis to conclude that Officer Arce was familiar with Valentin's appearance when the security footage was recorded.

Of course, a witness may be able to help the jury identify the person in a picture even when the witness is not familiar with how the person looked when the picture was taken.  For example, we have previously reasoned that an

---

[12] There is a reason that organizers of high school reunions give attendees name badges.

identification opinion could be appropriate from a lay witness who had previously become "intimately familiar" with the person being identified "over time and in a variety of circumstances."[13]    The logic underlying this theory of helpfulness is that repeated interactions in changing settings enable a witness to distill the defining features of a person's appearance, even when those features are subtle.[14]

However, Officer Arce was not intimately familiar with Valentin.  She testified that she had seen Valentin between 50 and 100 times over the course of her life, but only amidst family gatherings and possibly during one family vacation.  It is unclear how many other people attended these gatherings or this vacation, but it is doubtful that the events facilitated close interactions between Officer Arce and Valentin.  Officer Arce could not recall ever seeing Valentin in anything besides a t-shirt and jeans.  She did not know whether Valentin had any siblings.  Because of the age difference between Officer Arce and Valentin, Officer Arce had neither "grow[n] up with" Valentin nor "h[u]ng in the same crowds" as him.[15]  Officer Arce had never even seen any of Valentin's social media pages, did not know where Valentin lived, and did not even have

---

[13] *Fulton*, 837 F.3d at 298 (quoting *Beck*, 418 F.3d at 1015).

[14] *See id.* (citing *United States v. Jackman*, 48 F.3d 1, 5 (1st Cir. 1995) ("Human features develop in the mind's eye over time. These witnesses had interacted with defendants in a way the jury could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance." (quoting *United States v. Allen*, 787 F.2d 933, 936 (4th Cir. 1986))).

[15] Supp. App. 226–227.

Valentin's phone number.  Most tellingly, she could not say at trial, one way or the other, whether the man in the security footage was Valentin.[16]

Prior to trial, Officer Arce had identified Valentin in the security footage during an interview with the Elizabeth Police Department.  But the recording of this interview provides little evidence that Officer Arce was intimately familiar with Valentin.

In the video, Officer Arce identified Valentin in essentially three different pictures taken from the security footage.  When prompted to explain how she knew the person in the first picture was Valentin, Officer Arce hesitated, then said: "I kinda know it's him because . . . I just know.  Like, I can see it in the ears and the nose and the eyes . . . the body."[17]  As for the second picture, Officer Arce explained that she identified Valentin because the man in that picture was "wearing the same hat, same clothes as the other photo."[18]  For the third picture, Officer Arce explained that she had identified Valentin "because of the previous photos."[19]

Officer Arce's references to the body parts she could see in the first picture of the robbery suspect were too vague and conclusory to provide assurance that her identification was

---

[16] Supp. App. 264 ("Q. [A]s you sit here today, are you sure that that was William Valentin in those photos? A. No.").

[17] *See* Dkt. No. 86, Recording of Ashley Arce Interview at 19:10:20–42.

[18] *Id.* at 19:11:37–43.

[19] *Id.* at 19:12:45–55.

based on intimate familiarity with Valentin's basic features, much less any subtle ones.[20] Officer Arce did not explain what features of Valentin she saw in the man's ears, nose, eyes and body that an ordinary jury member would not have noticed. And it is clear that Officer Arce's two other identifications were based not on any of Valentin's or the man's features but entirely on the fact that the robbery suspect was wearing the same clothing in each picture.

Because Officer Arce had not seen Valentin in so much as a social media post over the decade preceding the robbery, could not describe the basis of her pre-trial identification with any insightful specificity, and went on to recant that identification at trial, she simply was not sufficiently familiar with Valentin to help the jury identify him as the person in the security footage.

## II.

There is also reason to doubt that Officer Arce's identification was even based on her perception (i.e.

---

[20] *Fulton*, 837 F.3d at 298 ("At least in theory, a witness who is intimately familiar with a defendant's appearance can perceive similarities and differences that jurors might not notice."); *see also United States v. Howell*, 17 F.4th 673, 684 (6th Cir. 2021) ("When a witness has not identified the objective bases for their opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701 . . . because the opinion does not help the jury but only tells it in conclusory fashion what it should find." (brackets omitted) (quoting *United States v. Hampton*, 718 F.3d 978, 981 (D.C. Cir. 2013))).

"reliable"). The circumstances surrounding Officer Arce's identification were certainly suggestive and very possibly coercive.

Officer Arce testified that she first identified Valentin about a week before she gave her recorded interview. At that time, six to eight federal and local law enforcement officers had detained Officer Arce and her family in a jetway as they were boarding a flight for a family vacation. As some of the agents searched Officer Arce's carry-on bag, FBI agents questioned Officer Arce and asked her to identify a man in a series of pictures. First, they showed Officer Arce a "very clear picture" of Valentin wearing a dark baseball cap, though not the same baseball cap that the suspect was wearing in the security footage.[21] The agents then showed Officer Arce pictures of one of the robbery suspects from the security footage. Officer Arce testified that she initially told the agents she could not identify the robbery suspect. Rather than respect that response, one of the agents responded: "You know what the fuck your family does. We'll fuckin' charge you, you'll lose your fuckin' job."[22]

Unsurprisingly, Officer Arce then identified the suspect as Valentin. When she did, two of the detectives who were present looked at each other as though "a light bulb went off in their head[s]."[23] Also unsurprisingly, the agents then finally permitted Officer Arce and her family to board their flight.

---

[21] Supp. App. 260.

[22] Supp. App. 228.

[23] Supp. App. 219.

When Officer Arce returned from vacation, two
Customs and Border Protection agents approached her at the
airport and instructed her to come with them.  They brought
Officer Arce to a room in which another six to eight law
enforcement officers were waiting.  These law enforcement
officers told Officer Arce that they wanted her to come to the
Elizabeth Police Department for an interview.  The law
enforcement officers also told Officer Arce that they had
notified her Internal Affairs captain that they would be
speaking to her, but the agents did not explain *why* they had
notified Internal Affairs.  Officer Arce acquiesced and went to
the Elizabeth Police Department.

There, she gave her recorded statement identifying
Valentin in the security footage.  This interview was conducted
by two detectives who had been investigating the robbery and
who knew Valentin was a suspect for the robbery—the same
detectives who had detained Officer Arce in the jetway.

During the interview, immediately before the detectives
showed Officer Arce pictures of the robbery suspect, they
showed her a relatively clear picture of a man wearing black
clothing and a black baseball cap who was staring straight into
the camera.  Officer Arce had no difficulty identifying the man
in this picture as Valentin.  The detectives briefly whispered to
each other and then informed Officer Arce that they would like
to show her a different set of pictures.  The detectives then
showed Officer Arce pictures of the robbery suspect taken
from the security footage in which the robbery suspect was also
wearing black clothing and a black baseball cap.  Only *after*
Officer Arce had completed the identification procedure and
positively identified Valentin did the agents tell her they had

called her Internal Affairs captain as a mere formality and that she would not get into any trouble.

This identification procedure was certainly suggestive.[24] First, it was not conducted blindly because it was administered by the very detectives who were investigating the robbery. Blinding is critical to prevent the identification's administrator from giving, and the witness from observing, conscious or unconscious cues about the suspect's identity.[25] This source of suggestion is not merely theoretical in this case. Officer Arce believed a "light bulb" had gone off for the detectives when she first identified Valentin in the jetway.[26] Similarly, during the recorded interview, when the detectives whispered to each other and suddenly switched to showing Officer Arce pictures of the robbery suspect after Officer Arce had identified Valentin in another photo, Officer Arce may reasonably have inferred that the detectives believed the robbery suspect was Valentin.

---

[24] *See, e.g.*, Third Circuit Task Force, *2019 Report on Eyewitness Identifications*, 92 TEMPLE L. REV. 1 (2019) (hereinafter "Third Circuit Report on Eyewitness Identifications").

[25] *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 321 (3d Cir. 2016) (McKee, J. concurring) (noting that "[o]ne of the most important system variables that law enforcement can control is the blinding of identification procedures" because it "prevent[s] the officer [administering the identification procedure] from giving the witness conscious or unconscious cues that can affect the witness' identification").

[26] Supp. App. 218:5–219:3.

A second source of suggestiveness was the similarity between the clothing Valentin was wearing in the first picture Officer Arce was shown and the clothing the robbery suspect was wearing in the subsequent pictures.[27]  Because Officer Arce was shown a clear picture of Valentin wearing black clothing and a black baseball cap just before she was shown a picture of the robbery suspect in similar clothing, Officer Arce was primed to identify the suspect as Valentin based on the suspect's clothing alone.

Beyond mere suggestion, however, Officer Arce's testimony also leaves me with serious concern that her identification was based more on coercion than on her perception.  According to Officer Arce, she first identified Valentin while she was detained amidst highly stressful circumstances and only after the agents explicitly threatened that they would cause her to lose her job if she did not make an identification.  She then provided her recorded identification only after law enforcement officials detained her again and told her that they had contacted her Internal Affairs captain—implying that her job was in danger.  The detectives who conducted Officer Arce's identification ultimately told her that

---

[27] *Cf.* Third Circuit Report on Eyewitness Identifications, *supra* n.24, at 45 (citing Jennifer E. Dysart et al., *Show-ups: The Critical Issue of Clothing Bias*, 20 APPLIED COGNITIVE PSYCHOL. 1009, 1019 (2006) (finding, following a substantially randomized and controlled trial, that "if a person who resembles the perpetrator is apprehended near the scene of the crime, and is wearing distinct clothing similar to that described by the eyewitness, the likelihood of false identification is considerable")).

she would not face repercussions for speaking with them, but they did so only *after* Officer Arce had identified Valentin.

The timing was certainly not coincidental; and the scare tactics seem to have worked.  Officer Arce testified,  "I was just scared. I thought I was going to lose my job . . . . I was just scared that if I didn't basically say what I said in the airport that I was going to be in trouble."[28]  An identification obtained through coercion surely would not satisfy the requirement of Rule 701(a).  More importantly, courts should discourage this type of overreach in identification procedures and refuse to admit any identifications they produce.

## III.

To be sure, Officer Arce's testimony at trial was somewhat inconsistent with her recorded statement, in which she stated that she had seen Valentin "thousands" of times and that she had not been threatened into identifying the suspect as Valentin.[29]  We are in no position to decide which version of the story is true.  But the inconsistencies between Officer Arce's testimony and recorded statement highlight a more fundamental problem with the District Court's ruling: despite knowing that Officer Arce might recant her recorded identification, and even though Officer Arce was present and available, the District Court did not subject Officer Arce to examination outside the presence of the jury before deciding whether she was competent to offer a lay opinion identification.

---

[28] Supp. App. 249:3–9.

[29] Supp. App. 192.

Had the District Court heard Officer Arce's reasons for recanting and been able to assess Officer Arce's credibility before it ruled, the District Court may have come to a different decision.  Alternatively, the District Court may have found Officer Arce's recantation incredible, and we would defer to that determination.[30]  But the District Court made its decision on the limited information that was available from the video recording and counsel's proffers.  As a result, I am left with concerns about Officer Arce's recantation and doubts about the reliability of her identification.[31]

## IV.

The dangers of admitting improper identifications cannot be overstated.  False eyewitness identifications are the leading cause of wrongful convictions.[32]   While this case

---

[30] *Copperweld Steel Co. v. Demag-Mannesmann-Bohler*, 578 F.2d 953, 964 (3d Cir. 1978) ("In review of the factual underpinning for the admission of the evidence, we must decide only if the findings of fact are clearly erroneous.").

[31] The District Court seems to have shared this concern and ordered the Government to make Officer Arce available for a Rule 104 hearing for these very reasons.  As the District Court explained: "[I]f there were someone that says, I identified him because I was his cousin . . . a month or two after the robbery, but today [has] no idea [who the suspect is], that would suggest to me that the person really didn't have intimate familiarity with the person [being identified]."  Supp. App. 1243.

[32] *See* Third Circuit Report on Eyewitness Identifications, *supra* n.24, at 10–11.

concerns lay opinion identifications rather than eyewitness identifications, the same dangers are present here. Given the extreme prejudice that typically follows a false identification, I am reluctant to find harmless error when an identification is improperly admitted.

Nevertheless, in this particular case, I believe the evidence of Valentin's guilt was so overwhelming[33] that the

---

[33] My colleagues summarize much of the evidence supporting Valentin's convictions at note 7 of their opinion. *See* Maj. Op. at 11 n.7. I agree that this evidence establishes harmless error for Valentin's robbery and conspiracy convictions. As for Valentin's conviction under 18 U.S.C. § 924(c)(1)(A)(ii) for brandishing a firearm during the robbery, I believe it necessary to put a finer point on the evidence supporting Valentin's conviction.

The evidence my colleagues cite establishes Valentin's presence at the scene of the crime, general participation in the crime, and prior agreement to participate in the crime. For the § 924(c) charge, however, the critical question was whether Valentin was the specific individual who brandished the gun. As the District Court noted, there was no evidence that anyone else involved in the robbery had a gun, so Valentin could not have been convicted under this count on an accomplice theory.

Setting aside Officer Arce's identification, two other sources of evidence support the jury's verdict that Valentin was in fact the individual who brandished the gun: the pictures from the security footage themselves and the testimony of Valentin's accomplice. While the security footage pictures were not so clear as to render lay opinion identification entirely

erroneous exclusion of the detectives' identifications and admission of Officer Arce's identification do not undermine my confidence in Valentin's convictions.[34]  Accordingly, I join my colleagues in their judgment as well as all aspects of their opinion except their discussion of the District Court's lay opinion identification rulings.

───────────────

unnecessary, they were clear enough that the jury could reasonably have concluded through its own direct comparison that Valentin was the man in the pictures.

Further, the accomplice's testimony was so thoroughly corroborated by the evidence my colleagues cite that the accomplice's specific testimony that Valentin was the leader and organizer of the robbery and the individual who brandished the gun was particularly damning.  And while Officer Arce's identification should never have been presented to the jury for the reasons I explain above, its potential prejudice was mitigated by the fact that Valentin's counsel effectively used cross examination to inform the jury of the limitations of Officer Arce's ability to make an identification and of the suggestive and coercive circumstances that surrounded her identification.

[34] *United States v. Auernheimer*, 748 F.3d 525, 539 (3d Cir. 2014) ("In order for an error to be harmless, the Government must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.") (internal quotation marks omitted) (quoting *Gov't of V.I. v. Davis*, 561 F.3d 159, 165 (3d Cir. 2009)).